ADOPTION OF ASTRID.[1]

No. 96-P-1713.

Middlesex. January 14, 1998. - October 2, 1998.

Present: PORADA, KAPLAN, & BECK, JJ.

*Adoption,* Care and protection, Dispensing with parent's consent. *Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Minor,* Care and protection. *Waiver. Constitutional Law,* Self-incrimination. *Evidence,* Child custody proceeding, Hearsay, Business record, Authentication of document, Prior misconduct. *Practice, Civil,* Consolidation of actions. *Word,* "Abandoned."

In a proceeding to dispense with parental consent to adoption, the parents' failure to raise certain grounds of objection to a statement the mother had given to an investigator constituted waiver of the objection for purposes of appellate review; moreover, the statement, given under a grant of immunity from prosecution, was admissible in any event. [542-544]

Evidence at a proceeding to dispense with parental consent to adoption warranted the judge's use of the term "abandoned" in reference to the child. [544]

Evidence at a proceeding to dispense with parental consent to adoption was sufficient to warrant the judge's conclusion that the child had made a good adjustment with her preadoptive parents and that she would be harmed by removal from their home. [545]

In a proceeding to dispense with parental consent to adoption, the judge did not err in admitting in evidence an investigator's report, including opinions, recommendations, and conclusions, where the investigator testified, her sources were identified, and the parents had the opportunity to rebut any adverse or erroneous material. [546]

In a proceeding to dispense with parental consent to adoption, the judge erred in admitting in evidence an addendum to an investigator's report that contained unauthenticated documents; however, there was no prejudice because the judge would have reached the same result whether or not he considered those documents. [546-547]

In a proceeding to dispense with parental consent to adoption, a single erroneous reference in the judge's fifty-eight findings of fact to alleged but unproven threats to the court by the parents was harmless, where it had little impact on the judge's ultimate findings regarding fitness of the parents and the best interests of the child. [547-548]

In the circumstances, there was no error in a District Court judge's allowing a motion of the Department of Social Services to amend a pending care and

[1]This name is a pseudonym.

protection petition to add a claim to dispense with the need for parental consent to adoption. [548-549]
In a proceeding to dispense with parental consent to adoption, the evidence of the parents' unfitness was overwhelming and the judge's findings were supported by clear and convincing evidence. [549]

PETITION filed in the Newton Division of the District Court Department on October 20, 1993.

The case was heard by *Conrad J. Bletzer*, J.

*Margaret M. Geary* for the mother.

*Charles G. Murphy* for the father.

*Peter T. Wechsler*, Assistant Attorney General, for Department of Social Services.

*Patricia A. Cantor* for the child.

BECK, J. Astrid was born in Massachusetts on October 15, 1993. Her parents' home State is more than 1,000 miles away. The mother came to Massachusetts on October 6, 1993, gave birth, and returned to the parents' home State on October 20, 1993, a few hours after the Massachusetts Department of Social Services (DSS) obtained an emergency order granting DSS temporary custody of the five day old baby. So far as the record shows, the father has never been in Massachusetts. Astrid has lived with her preadoptive foster parents since July, 1994.

Neither parent has attended any of the proceedings in Massachusetts concerning custody of Astrid. After a four-day trial conducted over a five-month period, a District Court judge concluded that the parents are unfit to raise Astrid and that it is in the child's best interests to dispense with the parents' consent to adoption. The parents appeal.[2]

The mother challenges the admission of a statement regarding the death of the couple's first daughter that she gave prosecutors in her home State under an immunity agreement. The father claims there was insufficient evidence to support the judge's findings that the parents abandoned Astrid and that she would be harmed by removal from her preadoptive home. He also claims that the judge erred in considering out-of-State evidence concerning the parents' conduct toward their other children and evidence of the parents' threatening behavior toward officials in Massachusetts. Finally, he argues that the judge should not have allowed DSS to amend the custody petition to include a petition to dispense with parental consent to adoption.

---

[2]Appellate counsel were not trial counsel.

*Facts.* The judge made the following findings based on testimony at trial. Prior to the mother's arrival in Massachusetts, the father telephoned Adoptions with Love (adoption agency or agency), a private adoption agency in Newton, and discussed the parents' intention to surrender for adoption the baby they were expecting. The agency advertises nationally in telephone books and pays for all travel and medical expenses associated with a baby's birth, whether or not a birth mother ultimately decides to proceed with the adoption. After her arrival in Massachusetts, but before giving birth to Astrid, the mother told an agency social worker "some vague details" about the death of the parents' first child and the parents' loss of custody of their second child. The mother declined to authorize contact with officials in the parents' home State.

Astrid was born with a heart problem. She was also clinically jaundiced and at extreme risk for anemia. Shortly after her birth, the mother expressed reservations about proceeding with the adoption as planned. Concerned about releasing the baby to return to the home State with the mother, given the baby's health and limited but disturbing information about the parents' history with their other children, the agency contacted DSS. DSS's contact with the home State officials prompted DSS to initiate emergency custody proceedings. On October 20, 1993, the court awarded temporary emergency custody to DSS. Although the mother agreed to remain in Massachusetts to attend the seventy-two hour custody hearing scheduled for October 22, 1993, she did not appear, having already returned to her husband. DSS was granted custody of Astrid at the seventy-two hour hearing.

The parents' history with their two children born in the home State, as introduced at trial primarily through the testimony of the independent court investigator and of Corporal Dwayne Isringhausen, a criminal investigator from the home State, was as follows. After taking their first daughter from the hospital against medical orders, the parents disappeared. Authorities could not locate them, because they had given numerous false addresses. A year after the birth of their first child, the couple had a second child, a son, who was taken into protective custody shortly after birth. The investigation and court proceedings resulting in termination of the parents' rights to consent to the adoption of the second child prompted authorities to resume their search for the first child. Isringhausen finally found the

parents' home: they were living in a pop-up camping trailer located in a wooded rural area on an unmarked road. When asked about the baby daughter, the father requested a written guarantee against prosecution before answering. Isringhausen refused. The father became irate and denied that the baby had ever existed.

Isringhausen obtained a search warrant and returned to the parents' property. Neither parent cooperated, and he arrested both, charging them with endangering the welfare of a child. Shortly thereafter, the mother agreed to reveal the location of the baby's body and consented to a second search. During that search, the mother led the investigator to an area within 200 feet of the camper. Isringhausen found the baby's remains in a shallow grave. The baby's body was too badly decomposed to determine the cause of her death. Ultimately, the father pled guilty to endangering the welfare of a child and served four months of a one-year sentence.

The judge also found that the mother "effectively abandoned" two older children in the home State, both born during her marriage to her previous husband. In his last finding of fact, the judge noted that neither parent appeared for trial, despite what he described as "unprecedented, extraordinary efforts by their counsel," including the Commonwealth's agreement to pay the parents' airfare and hotel accommodations.

1. *The immunity agreement.* The mother gave a statement to authorities in her home State in which she provided an account of the first baby's death. A cassette tape recording of the statement was admitted in evidence at trial, and Corporal Isringhausen, who was present when the mother gave her statement, testified as to its contents at trial.

Briefly, the substance of the mother's statement was as follows. The night before the baby was found dead, the father forced the mother to put the baby, who was four months old at the time, in an inoperable van parked near the camper because he didn't want to hear the baby cry. The father then put pots and pans on a chair in front of the door to the camper to make noise in case the mother tried to get up to go to the baby. During the night, the mother heard the pots and pans being moved, felt cool air from the door, and heard the father walk out of the camper toward the van. When the mother went to the van the next morning, the baby was dead. The baby was wet with sweat (it was July and the van was hot), with her feet curled up under

her. The area around the baby's nose and lips was blue or purple. There was a large blanket over the baby's head, which had not been there when they put her to bed. The father said the baby got what she deserved.

At trial, counsel for the mother objected to the investigator's testimony on the grounds of relevance and hearsay, as well as prejudice, which the judge properly overruled. On appeal, the mother presents a tangle of other grounds for excluding the statement, citing statutes and case law in the Commonwealth, as well as her home State, relating to the privilege against self-incrimination, immunity principles, and voluntariness to support her arguments. DSS argues that, by failing to object on these grounds, the mother has waived these arguments.

A party may not raise an issue before the trial court on one ground, and then present that issue to an appellate court on a different ground. *Kagan* v. *Levenson*, 334 Mass. 100, 107 (1956). *Commonwealth* v. *Tyree*, 387 Mass. 191, 213 (1982), cert. denied, 459 U.S. 1175 (1983). See *White* v. *White*, 40 Mass. App. Ct. 132, 133 (1996) (party not entitled to present an argument on appeal on an issue not presented in the court below absent exceptional cases or particular circumstances where injustice might otherwise result). The circumstances of this case illustrate the reasons for this rule. Not only does the mother ask that we reverse the trial judge on an evidentiary question on grounds the trial judge never had an opportunity to address, but in order to support her new argument, she seeks to add to the record the immunity agreement and an affidavit of the prosecuting attorney, neither of which was entered in evidence below.

The mother argues that her failure to identify the proper grounds for objection should be excused because issues regarding an immunity agreement are not likely to arise in child custody cases. However, her reliance on the clairvoyance exception in *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10 (1986), to support this argument is misplaced. That exception applies when the constitutional principle at issue has not been sufficiently developed to expect counsel to make the objection and the principle is subsequently applied retroactively. *Id.* at 16-17. Such is not the case here. Moreover, the parents had copies of the mother's statement prior to trial because it was produced as part of the attachment to the court investigator's report. The first few pages of the transcript include discussion of the "Agreement of Immunity." We conclude that the parents did

waive this objection. But even were we to excuse the mother's failure to recognize the issue, the statement was admissible.

Despite the fundamental rights at issue, "[c]ustody proceedings are not criminal in nature and, accordingly, the full panoply of constitutional rights afforded criminal defendants does not apply in these cases." *Custody of Two Minors*, 396 Mass. 610, 616 (1986). "[T]he State does not act to punish misbehaving parents but to protect children." *Ibid*. The cases have consistently "rejected . . . opportunities to rule that certain constitutional rights attaching in a criminal proceeding apply in custody cases," *id*. at 617, including Fifth Amendment rights. *Ibid*. See *Commonwealth* v. *Barboza*, 387 Mass. 105, 114, cert. denied, 459 U.S. 1020 (1982) (privilege protects only disclosures that could be used in prosecution and does not prevent disclosures from being used in non-criminal commitment proceedings).

As a matter of constitutional principle, an immunity agreement must be co-extensive with a witness's right against self-incrimination. *Kastigar* v. *United States*, 406 U.S. 441, 453 (1972) (use immunity). *Patch* v. *Mayor of Revere*, 397 Mass. 454, 456 (1986) (transactional immunity). See *Attorney Gen.* v. *Colleton*, 387 Mass. 790, 795-799 (1982). The mother cannot be prosecuted for any matter covered in the immunity agreement, see *State ex rel. Munn* v. *McKelvey*, 733 S.W.2d 765, 770 (Mo. 1987) (doctrine of equitable immunity), even though at the time of the agreement, prosecuting attorneys in the home State had no authority to confer immunity on a witness because there was no statute granting them such power. See *id*. at 769. Massachusetts has also honored stipulations of immunity not based on statutory authority when a witness has relied upon the agreement by giving testimony "to ensure that the public faith pledged [to the witness] is duly and fully kept." *Matter of De-Saulnier (No. 2)*, 360 Mass. 761, 764 (1971). This is all the Federal or State constitutions require. See *Matter of Pressman*, 421 Mass. 514, 516 (1995). See also *Patch* v. *Mayor of Revere*, *supra* at 455-456 (public employer may compel employees, under threat of discharge for non-cooperation, to answer questions "reasonably related to the employee's ability and fitness to perform his official duties" so long as answers cannot be used against them in criminal prosecution). We reject the mother's suggestion that she is entitled to the greater protections of G. L. c. 233, § 20G, prohibiting use of immunized testimony even in civil proceedings. As in *Matter of Pressman*,

where a lawyer was disbarred based on testimony given under a grant of Federal immunity, *supra* at 517, the Supreme Judicial Court here had no opportunity to consider the mother's agreement or its terms, as G. L. c. 233, §§ 20A - 20G require.

Moreover, we doubt that the mother suffered any prejudice from the admission of the statement. The statement is factually different from, but not necessarily more inculpatory, than a statement she made to her cellmate which was properly admitted as part of the court investigator's report. The statement shows the pattern of conflicting stories the mother has told — to authorities, to her cellmate, and to the social worker — regarding the parents' role in the baby's death.

2. *Abandonment.* The father argues that there is no evidence to support the judge's finding that the parents "effectively abandoned" Astrid. Citing the definition of the term "abandoned" as set out in G. L. c. 210, § 3 ("left without any provision for support, and without any person responsible to maintain care, custody, and control because the whereabouts of the person responsible is unknown and reasonable efforts to locate such person have been unsuccessful"), he asserts that the State took custody of the child and that the parents have "vigorously contested" DSS's efforts to maintain custody. While we agree that the statutory meaning of the word "abandoned" in this context does not entirely apply to the situation here, the judge's use of the word is not unwarranted on the particular facts of this case. The parents have done little to express interest in their child. Although the mother was in Massachusetts, she did not wait the seventy-two hours to attend the care and protection hearing. Neither parent attended the termination hearing even though the Commonwealth agreed to pay for airfare and lodging. Nor did they respond to any of the court investigator's attempts to interview them. The only evidence of their interest in the child and these proceedings included occasional communication with counsel; requests that counsel withdraw in the middle of trial; and a request for a photograph and a visit with the child on a day already scheduled for the termination hearing. (DSS denied the request for a visit as not being in the child's best interest, as well as because of concerns about safety and convenience.) In any case, the finding of abandonment was not central to the finding of unfitness. Cf. *Care and Protection of Leo*, 38 Mass. App. Ct. 237, 243-244 (1995).

3. *Removal from preadoptive home.* The judge found that Astrid has "a strong, positive bond" with her preadoptive parents and that removal from their home "would likely cause her severe harm." The father claims that there was insufficient evidence to support this finding. We disagree.

The judge heard testimony from the court appointed investigator and a DSS adoption social worker who visited Astrid in the preadoptive home every month. At the time of the judge's decision, Astrid had lived with the family for more than a year. The preadoptive mother is a nurse who is familiar with the pediatric cardiac care Astrid needs. The DSS social worker testified that the child has made a "very good adjustment" and has a "very normal, appropriate, bonded relationship" not only with her preadoptive parents but also with the extended family of grandparents and other relatives. The social worker described the child as "happy." The judge's inference, that a child who has made a good adjustment with preadoptive parents who have the special skills necessary to monitor her cardiac condition would be harmed by removal from that home, was not clearly erroneous.

4. *Out-of-State evidence.* Not surprisingly, given the parents' minimal connection with the Commonwealth and substantial documented history elsewhere, much of the information in the court investigator's report was from the home State. There was also information regarding the father's history in yet a third State: he had been abusive to a first wife and the five children of that marriage; his parental rights as to those children had been terminated; and he had a police record in that State. In addition to the report, the investigator submitted a lengthy addendum. The addendum contained the following items: hospital records relating to Astrid's birth in Massachusetts; medical records from the home State regarding the parents' two other children; police reports from the home State concerning the investigation of the first child's disappearance and death; other police reports from the home State; protective services and juvenile court records from the home State; police reports, protective services reports, and juvenile and probate court records from the third State; and assorted other documents. Although the parents objected to admission of the opinions, recommendations, and conclusions in the investigator's report, they particularly objected to the admission of the addendum on the grounds that many of these documents were not authenti-

cated and that they included "totem pole hearsay." The judge admitted the report but withheld action on the addendum until the end of trial. The mother raised this evidentiary issue again in her closing argument, but the judge never formally ruled on it. The parties' briefs assume that the documents were admitted, and the judge's findings make clear that he relied on them.

There was no reversible error in the admission of the investigator's report, even including her recommendations, because she testified and the report identified, for the most part, her sources. See *Adoption of George*, 27 Mass. App. Ct. 265, 274 (1989); *Custody of Michel*, 28 Mass. App. Ct. 260, 263-264 (1990); *Adoption of Sean*, 36 Mass. App. Ct. 261, 263-264 (1994). The parents, therefore, had the opportunity to rebut any adverse or erroneous material. See *Custody of Michel, supra* at 266. Although the sources of information from the third State were not identified, the material regarding the third State was less than one-half page of a twenty-three page report and excluding that material would not change the result here. See *Care and Protection of Leo*, 38 Mass. App. Ct. at 244.

The documents in the addendum are another matter. The parties' joint pretrial memorandum includes a proposed exhibit list. Among the documents listed are "certified copies" of various medical, social service, and police records from the home State and the third State. Such documents may be admitted in custody proceedings. See *Adoption of Paula*, 420 Mass. 716, 727 (1995) (police records admissible as business records); *Custody of Two Minors*, 19 Mass. App. Ct. 552, 560-561 (1985) (hospital records); *Adoption of George, supra* at 271-272 (DSS records admissible as records of public agency under official records exception to the hearsay rule). See generally Liacos, Massachusetts Evidence § 8.11.1, at 490 (6th ed. 1994). However, in fact, none of the documents attached to the investigator's report in this case was "certified" or otherwise authenticated. This lapse is of particular concern because so many of the documents are from out of State. At the very least, Isringhausen, the home State criminal investigator who testified, could have authenticated his own reports, but he was never requested to do so.

But even if it was error to admit the addendum, assuming the judge did admit it, there was no prejudice because the judge would have reached the same result whether or not he considered the information in the documents attached to the

court investigator's report. See *Care and Protection of Leo,* 38 Mass. App. Ct. at 238. As a general matter, however, we remind counsel that parties submitting records such as those at issue here, particularly when the records are from out of State, should adhere to the rules of evidence as to authentication and certification, or risk having the evidence excluded. See generally G. L. c. 119, § 21. See also G. L. c. 233, §§ 76, 79, 79A, 79J.

5. *Parents' threats and intimidation.* In his cross-examination, counsel for the father questioned the DSS social worker about the October 20, 1993, meeting at the hospital after DSS had obtained emergency custody of Astrid. Among other issues, he focused on the presence of police at the meeting. The judge interrupted with the following comments:

> "Before we go any further . . . there is a little bit of background that I assume you are all aware of, that there were a number of threats made on this [c]ourt and the hospital personnel concerning this child. I assume everybody is aware of that. . . .

> "[T]here were a number of threats made that whoever the judge was was going to be killed in this matter [*sic*], and other people were going to be hurt. So, I assume you're aware of that. That might be one reason why the presence of a . . . detective . . . .

> "There [were] a number of phone calls made to this court and to the hospital."

There was no objection to these comments, although counsel for the mother commented, "I don't know how to respond to that." In his findings, the judge noted that rather than appearing at the trial, "[t]he parents chose . . . to proceed . . . by engaging in threats and intimidation through letters to the court."

On appeal, the father claims there is no evidence to support this finding. He is correct; the judge's remarks were not evidence. See Greaney, Massachusetts Jury Instructions, Civil § 1.14(b) (1977) ("The evidence does not include . . . anything [the judge] might have said"). Because there is no evidence to support the finding, it is clearly erroneous. See *Adoption of Harriet,* 29 Mass. App. Ct. 111, 114 (1990); *Adoption of Ramon,* 41 Mass. App. Ct. 709, 713 (1996). Aside from the fact that there was no objection to the remarks at trial, see *Adoption*

*of Mary*, 414 Mass. 705, 712 (1993), the single sentence on threats in one of the fifty-eight findings of fact had little impact on the ultimate findings of fitness and the best interests of the child required in an adoption proceeding. G. L. c. 210, § 3(*c*). The error was harmless.

6. *Bifurcation of the proceedings.* The father also complains of "a mid-trial transformation of the case from a custody proceeding into a termination proceeding." He argues that "[t]he confusion and uncertainty of the status of the proceedings coupled with the substantial reliance which the Court placed on the evidence initially received only in relation to the custody case in terminating the parental rights was fundamentally unfair." Although as trial counsel for DSS acknowledged, "both amending the petition and providing service on it from the beginning [were] marked by more unfortunate. circumstances than a Thomas Hardy novel," the father's argument is without merit.

The judge heard evidence over four days: February 15, March 2, May 10, and May 11, 1995. Apparently in June, 1994, DSS had filed a motion to amend the pending care and protection petition by adding a claim to dispense with the need for parental consent to adoption pursuant to G. L. c. 210, but it had not been docketed or served. The judge allowed the motion to amend on February 15 before beginning the trial. By agreement, the parents filed a "motion to bifurcate proceedings" so that the court could begin to hear evidence on the care and protection petition. Although they continued to insist on proper service of the amended petition, both parents explicitly stated that they did not object to the amendment. They may not now complain about the "bifurcation." See *Adoption of Kimberly*, 414 Mass. 526, 534-535 (1993). In any case, consolidation of a care and protection petition with a termination proceeding is expressly authorized, *Care and Protection of Martha*, 407 Mass. 319, 328 (1990), and may provide a mechanism for avoiding delay in the litigation of custody and adoption disputes, *id.* at 329, as was the case here. This is not a case in which findings from the care and protection proceeding are out of date, *Adoption of Frederick*, 405 Mass. 1, 5-6 (1989), or in which the parents' incentive to litigate changed in the course of trial. *Id.* There was no confusion or prejudice. As to the father's argument that service of the amended petition was improper, the judge determined to the contrary after an evidentiary hearing. We defer to the judge's

assessment of the credibility of the process server, see *Custody of Two Minors*, 396 Mass. 610, 618 (1986), especially in light of the returns of service, which corroborate the process server's testimony.

*Conclusion.* In sum, even excluding the findings regarding threats and the father's conduct in the third State, there was overwhelming evidence of the parents' unfitness: the death of their first child and the father's conviction for child endangerment in connection with her death; the mother's abandonment of the children of her first marriage; the parents' inability to nurture any of their children; and their utter failure to participate in any of the proceedings involving Astrid. The judge's findings of unfitness were supported by clear and convincing evidence.

*Decree affirmed.*