NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-850

ADOPTION OF ODILE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial in the Juvenile Court, a judge found the mother unfit to parent her child, Odile, and terminated her parental rights.[2]  On appeal, the mother challenges the judge's finding of current unfitness and the decision to terminate her parental rights.  The mother also argues that the judge erred and violated her due process rights by allowing the foster mother to attend the entirety of the 2021 hearing and the 2024 trial, and that the Department of Children and Families (department) made reasonable efforts toward reunification.  We affirm.

---

[1] A pseudonym.

[2] The father is not a party to this appeal.  He stipulated to unfitness and the termination of his parental rights at the 2021 hearing on the merits.

1. Background. We summarize the facts as found by the judge, who issued comprehensive, detailed findings of fact and conclusions of law.

A hearing on the merits (hearing) was held in 2021. The mother requested that all nonparties, including the foster mother, be sequestered; the judge denied her request. The mother continued to object to this ruling throughout the hearing. Following the hearing, the judge found that the mother was currently unfit, but that the department had not "met its burden by clear and convincing evidence that said unfitness is likely to continue into the indefinite future to a near certitude."

A review and redetermination and termination of parental rights trial (trial) occurred in 2024. At trial, the judge denied the mother's motion to sequester all nonparty witnesses. After trial, the judge found that the mother was currently unfit, that the unfitness was likely to continue into the indefinite future to a near certitude, and that the department's goal of adoption was in Odile's best interests. The judge's order provided for four supervised posttermination and four supervised postadoption visits per year between the mother and Odile.

The mother has two children, an older son, and the subject child.[3]  The mother became involved with the department in July 2018 after she brought her son to the hospital because he "fell out of their second-story apartment window."  The son is in his father's custody, and the mother has supervised visitation.

The mother and Odile's father[4] were in a relationship for two years prior to Odile's birth.  The mother has a history of "engaging in violence in her relationships."  While with her son's father, she applied for and obtained a G. L. c. 209A abuse prevention order after a physical altercation between them.  Although she testified that the father had a short temper, she denied the presence of domestic violence.  The judge did not credit the mother's denial.

Odile's birth was traumatic.  She suffered a "left clavicle fracture and right arm fracture," and was diagnosed with Erb's palsy.  Odile was in the neonatal intensive care unit for approximately two weeks.

At around three months old, Odile suffered "inflicted injuries from an unknown person."  The injuries were discovered

---

[3] The children do not have the same father.

[4] The father also has a history with the department, and lost custody of his oldest child because of neglect and physical abuse.  The mother testified that she knew about the father's involvement with the department but "denied knowing the extent of his other child's . . . injuries," until after Odile was injured.  The judge did not credit this testimony.

when the mother brought Odile to the hospital, after noticing that she was "warm to the touch . . . [and] didn't want to eat a lot," and "wasn't moving" her right arm "as she should."  Odile was in the care of her father the day the injuries were discovered.  Odile was seen by an expert in child abuse diagnoses, who reviewed x-rays and CT scans and concluded that Odile had a "fractured forearm, fractured ribs, fracture of the right wrist, fracture of the left foot, and bruising on the left side of her forehead and the right side of her back."  She also suffered "intracranial injuries accompanied by retinal hemorrhages."  The expert opined that the "injuries occurring after birth were most likely child abuse."  The mother did not have an explanation for how the injuries had occurred besides the "difficult birth."  The judge found that Odile's injuries were "the direct result of either abuse or gross neglect by [the m]other."

After Odile was discharged from the hospital, she was placed in a foster home.[5]  At that time, she "suffered from seizures.  Her arm was in a cast, she had broken ribs, fracture on her foot, and was not responsive to stimulus."  These

---

[5] The foster home is Odile's preadoptive placement.

conditions required extensive follow-up care, and the injury to her eyes will require surgery.[6]

The mother was initially "not cooperative" with the department's investigation of a report under G. L. c. 119, § 51A, alleging physical abuse of Odile by the father. She did not allow her son to be screened for injuries, nor did she want her son's father to be notified about Odile's injuries. At an interview with the department, when asked how she thought Odile's injuries occurred, the mother said that the "[f]ather told [her] that he placed [Odile] on a sectional couch and left both [Odile] and [her son] . . . in the living room . . . [and her son] was swinging a toy around, inferring that [her son] hit [Odile] with the toy." In his department interview, the father denied blaming the mother's son, and stated that "nothing unusual happened on the day Odile was brought to the hospital." The judge did not credit either of their accounts.

The mother testified that she was not concerned about the father hurting Odile until she knew the extent of the father's eldest child's injuries. At the hearing, the mother refused to blame the father for the injuries because she did not see the father abuse "any children." However, at the trial, the mother

---

[6] The mother does not want Odile to have the eye surgery because she felt that she "did not really need it."

testified that it was the father who injured Odile, but the judge found that these statements were "self-serving at best."

The mother participated in some services but failed "to be transparent with [the department] regarding therapy and her relationships." The mother "represented to the [department] that she was in therapy when in fact she was not." She also withheld information from the department about her dating relationships. Approximately eight months before the trial, the mother began a new relationship but did not disclose it to the department until a week before the trial started. The judge found that the mother is "resistant to acknowledging that her relationships with various men are an issue that reflect on her ability to parent."

The mother was also not forthcoming about where she was living. After Odile was removed from the mother's custody, she was evicted. The mother then lived with the father for a few months, until she moved in with the maternal grandmother, where she lived at the time of trial. Around December 2022, the mother changed her address and "planned to move in with a male friend, but the move fell through." Although she never moved, she continued to use the address for filings with the Probate and Family Court regarding her son and did not "provide sufficient information about the future roommate to the

[d]epartment." She did not cooperate with the department's home visits until July 2022.

The mother has struggled with her mental health and is diagnosed with depression, posttraumatic stress disorder, anxiety, social anxiety, and bipolar disorder. She was in and out of therapy due to insurance lapses, but the judge did not credit the mother's claim that she could not afford health insurance and was otherwise ineligible for MassHealth. She testified that she did not think therapy or medication was necessary because she has "always been able to control" her mental health. In April 2021, the mother had a psychological evaluation, but did not provide the report to the department until the day before the hearing. The evaluation recommended, in part, that the mother use a mood journal, but she did not do this until a few weeks before the trial.

Before the hearing, the foster mother "[p]rovided extra visits . . . shared photos and updates . . . [and] allowed [the mother] to attend doctor visits without [the department] present." This stopped after the hearing. The mother had four hours of visitation with Odile monthly, and it increased to six hours in February 2024.

2. Discussion. a. Unfitness and the termination of the mother's parental rights. "To terminate parental rights to a child, the judge must find, by clear and convincing evidence,

7

that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'" Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011). "We give substantial deference to the judge's findings of fact and decision, and will reverse only 'where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'" Id. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977).

The mother argues that the "judge's findings and the record . . . do not support the conclusion that [the m]other is currently unfit because they rely on stale evidence, are unsupported by the record, clearly erroneous and an abuse of discretion." We disagree.

The mother contends that the judge abused her discretion by relying on the mother's "hesitancy" to suggest that the father caused the child's injuries because "she had no knowledge of his past abuse and was not home when the injuries occurred." However, the judge did not credit this testimony. A judge's

8

finding on witness credibility is "quintessentially the domain of the trial judge [so that (her)] assessment is close to immune from reversal on appeal except on the most compelling of showings." Prenaveau v. Prenaveau, 81 Mass. App. Ct. 479, 496 (2012), quoting Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995). Here, the judge was in the best position to determine credibility and did not abuse her discretion by considering the mother's knowledge of the father's past abuse and her denial thereof in the evaluation of her unfitness. See id.; Adoption of Larry, 434 Mass. 456, 471-472 (2001) (failure of mother to protect child from father's physical abuse probative of mother's parental unfitness).

Additionally, the mother contends that "there was no new evidence during the [trial] regarding" the cause of Odile's injuries, and therefore the finding of unfitness is based on stale evidence. However, "[i]n review and redetermination hearings, the judge does not start with a blank slate, but builds on findings established in the preceding stages." Care & Protection of Erin, 443 Mass. 567, 570 (2005). A judge "may consider past conduct to predict future ability and performance." Adoption of Katharine, 42 Mass. App. Ct. 25, 32-33 (1997). Therefore, limited reliance on stale evidence may be appropriate where it is indicative of a larger pattern of conduct that extends to the present. See Adoption of Yvonne, 99

9

Mass. App. Ct. 574, 581 (2021). There was no error in considering the evidence about Odile's injuries from the hearing, as it would be "inefficient . . . to reestablish by proof facts already once established and not since altered." Custody of a Minor (No. 2), 22 Mass. App. Ct. 91, 94 (1986).

The mother next argues that the judge erred by terminating her parental rights because of her "alleged inconsistent engagement with services, [and] failure to address mental health concerns, or maintain transparency." However, the record supports the judge's findings that the mother did not consistently comply with the department's action plans. Although the mother was in therapy at times, she was not transparent and "represented to the [department] that she was in therapy," even when she was not. As discussed supra, she did not provide the department with her psychological evaluation until the day before the hearing. She was inconsistent about whether she believed she needed to be in therapy and did not engage in any other mental health services. Because these findings are supported by the record, it was not error for the judge to rely on her inconsistencies in treatment and lack of transparency with the department. See Adoption of Serge, 52 Mass. App. Ct. 1, 8 (2001) ("mother's lack of meaningful participation in recommended services was also relevant to the question of her fitness"). And contrary to the mother's

10

assertions, the judge drew the required nexus between the mother's "failure to partake" in services and the impact on Odile, finding that the mother's lack of consistency in service engagement and inability to be transparent with the department constituted "grievous shortcomings" that would "impact[] Mother's insight and ability to make sound choices regarding [Odile's] safety and wellbeing."[7]

The mother contends that the finding that she "had previously been prescribed medications for her mental health, but refused to take them" was erroneous. She claims that she stopped taking her one prescribed medication because she was "unable to wake up for emergencies when taking it," and the medication was for sleep, not her mental health. Even assuming this was error, its exclusion would not have changed the outcome, and therefore, any error was harmless. See Adoption of Ilian, 91 Mass. App. Ct. 727, 730 (2017) (considering error in "context of all of the evidence, we cannot say that the judge

---

[7] As an example of the mother's lack of insight that could place Odile at risk, the judge noted that the mother failed to disclose her significant relationship with "Nicholas" to the department for proper vetting until one week before the trial. The judge found that the mother, who "hope[d] [Nicholas was] telling her the truth" about his demographic information, "demonstrates very little insight as to how this could affect [Odile] if she [was] returned to her care." The judge made similar findings concerning the mother's online relationship with a man Odile referred to as her "friend."

11

abused her discretion or committed legal error in the ultimate decision to terminate the [mother's] parental rights").

The mother next contends that the judge "overstated the degree of Odile's needs." However, Odile's conditions required extensive follow-up care and the injury to her eyes required surgery. Odile is also continually monitored for a seizure disorder and must have "rescue medication" in case a seizure happens again. A judge may "use past conduct, medical history, and present events to predict future ability and performance as a parent." Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998). The mother's lack of understanding of the severity of Odile's injuries supported the judge's finding of unfitness. See Adoption of Jacques, 82 Mass. App. Ct. 601, 608 (2012) (unfitness finding was supported by mother's "limited understanding" of child's medical diagnoses).

The mother further claims that it was an error to terminate her parental rights due to her "failure to attend medical appointments," and that the finding that the mother "could have attended [the appointments] she missed with the help of her support network" was erroneous. Although the finding that the mother missed all the appointments in Worcester is not supported by the record, it was a harmless error, as the mother was inconsistent in attending Odile's medical appointments. The social worker testified that the mother had missed several

12

medical appointments, including one in Worcester. And the judge did not credit the mother's testimony that she missed these appointments due to lack of transportation. "We accord deference to a trial judge's assessment of the credibility of witnesses and the weight of evidence." Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011).

The mother argues that the evidence "regarding unstable housing four years before trial was stale and alleged instability of [the m]other's current housing was unsupported by the record and clearly erroneous." The mother acknowledges that she was evicted after Odile's removal, but states that she has lived in the same home since March 2020. However, the judge did not solely rely on the mother's eviction. She also found that the mother was not "forthcoming or cooperative with the [d]epartment in terms of home visits or updated contact information," and noted that the maternal grandmother, with whom the mother lived, was a caretaker of Odile around the time of her injuries. Any error was harmless because it did not contribute significantly to the judge's ultimate unfitness finding. See Adoption of Bea, 97 Mass. App. Ct. 416, 426 (2020) ("judge's conclusion that the mother was unfit was clearly and convincingly supported by the judge's [other] subsidiary findings").

13

In sum, we discern no clear error of law or abuse of discretion in the judge's unfitness determination and the decision that termination of the mother's parental rights was in the best interests of Odile. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 615-616 (2021).

b. Foster mother's attendance at the two proceedings. The mother contends that allowing the foster mother to attend the entirety of the hearing and the trial was "an error of law, a violation of [the m]other's due process rights, and contrary to Odile's best interests." She argues that the "'right to attend' in G. L. c. 119, § 29D does not allow a foster parent access to the entirety" of the proceedings. It is well established that the decision as to whether or not to sequester witnesses during care and protection proceedings is a matter entrusted to the discretion of the trial judge. See Adoption of Jacob, 99 Mass. App. Ct. 258, 269 (2021). Although it may be better practice to sequester a witness, including a foster parent, until after they testify, here, there was no prejudice to the mother. See Adoption of Sherry, 435 Mass. 331, 336 (2001) ("we need not disturb a judgment when error did not affect the outcome").

The mother argues she was harmed by the change in her relationship with the foster mother as a result of her presence at the hearing, because the judge considered the mother's failure to attend all Odile's medical appointments in her

14

finding of unfitness.  However, the mother still had the ability to attend Odile's medical appointments with the department's supervision.  Additionally, the mother did not lose any of her visits with Odile, as she continued to have visits supervised by the department, and the judge's order provides for those visits to continue.

Although the judge found that there was a change in the mother and the foster mother's relationship after the hearing, she did not rely on this to find the mother unfit.  See Adoption of Astrid, 45 Mass. App. Ct. 538, 546-547 (1998) (no prejudice where judge would have reached same result).  Therefore, "we discern no prejudice to the mother . . . , as the remaining evidence overwhelmingly supports -- by clear and convincing evidence -- that the mother was unfit as to the [child] and that termination was in [the child's] best interests."  Adoption of Ulrich, 94 Mass. App. Ct. 668, 680 (2019).

c.  Reasonable efforts.  Finally, the mother argues that the finding that the department "made reasonable efforts to facilitate reunification between the [hearing] and [trial] was unsupported by the record and clearly erroneous."  We disagree.  "Before seeking to terminate parental rights, the department must make 'reasonable efforts' aimed at restoring the child to the care of the natural parents."  Adoption of Ilona, 459 Mass. at 60, quoting Adoption of Lenore, 55 Mass. App. Ct. 275, 278

15

(2002).  "The department has a statutory requirement to make reasonable efforts, but discretionary authority regarding particular services."  Care & Protection of Rashida, 488 Mass. 217, 228 (2021), S.C., 489 Mass. 128 (2022).  "A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous."  Adoption of West, 97 Mass. App. Ct. 238, 242 (2020).

However, "[a] parent cannot raise a claim of inadequate services for the first time on appeal, as the department would not have had the opportunity to address it."  Adoption of West, 97 Mass. App. Ct. at 242.  Here, the mother failed to raise the issue of inadequate services and efforts at any time prior to entry of the decree.  Therefore, the issue has not been properly

preserved for appellate review and is waived.[8]  See id. at 242-243.

Decree affirmed.

By the Court (Blake, C.J.,
Meade & Tan, JJ.[9]),

*Paul Little*

Clerk

Entered:  March 20, 2026.

---

[8] Notwithstanding the issue of waiver, the judge did find, based on a number of subsidiary findings, that the department made reasonable efforts to reunite the mother and Odile, all of which was supported by the record.  Moreover, "[a] determination by the court that reasonable efforts were not made shall not preclude the court from making any appropriate order conducive to the child's best interest[s]."  Adoption of Ilona, 459 Mass. at 61, quoting G. L. c. 119, § 29C.

[9] The panelists are listed in order of seniority.