NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-922                                          Appeals Court

ADOPTION OF ULRICH
(and four companion cases[1]).

No. 17-P-922.

Suffolk.     November 8, 2018. - January 9, 2019.

Present:  Green, C.J., Meade, & Sacks, JJ.


Adoption, Dispensing with parent's consent.  Minor, Adoption.
    Parent and Child, Adoption, Dispensing with parent's
    consent to adoption.  Practice, Civil, Adoption, Assistance
    of counsel, Stay of proceedings.


    Petitions filed in the Suffolk County Division of the
Juvenile Court Department on December 27, 2012, and March 18,
2013.

    The case was heard by Stephen M. Limon, J.

    A motion to stay appellate proceedings was considered in
the Appeals Court by Hanlon, J.


    Deborah D. Wolf for Sarah & another.
    Briana R. Cummings for Ulrich & another.
    Robert E. Curtis, Jr., for the mother.
    Erin Staab, Assistant Attorney General, for Department of
Children and Families.
    Dana C. Chenevert for Ellen.

---

    [1] Adoption of Charles; Adoption of Sarah; Adoption of Amy;
and Adoption of Ellen.  The children's names are pseudonyms.

GREEN, C.J. The mother (joined on appeal by four of the children)[2] appeals from decrees of the Juvenile Court deeming her unfit to parent five of her children and terminating her parental rights.[3] The mother further contends that a single justice of this court erred in denying her motion to stay this appeal to allow her to pursue a motion for new trial in the Juvenile Court. We affirm the denial of the mother's motion for a stay, rejecting the mother's contention that such requests should presumptively be allowed. In addition, after careful consideration of the record and the judge's findings, we affirm the decrees.

Background. The mother has a criminal history dating to 2004, including convictions of assault by means of a dangerous weapon and assault and battery on a police officer. She has also been the subject of five abuse prevention orders issued pursuant to G. L. c. 209A, brought by five different individuals. On December 27, 2012, the Department of Children and Families (department) filed a care and protection petition on behalf of Ulrich (born in 2006), Charles (born in 2008),

---

[2] At trial, all five children supported termination of the mother's parental rights. On appeal, the four older children (Ulrich, Charles, Sarah, and Amy) now argue that termination was improper. Ellen still supports the termination.

[3] The judge also terminated the parental rights of the father; the father did not appeal from that determination.

Sarah (born in 2009), and Amy (born in 2011), after the mother was arrested for stabbing the father with a pair of scissors on December 26, 2012.[4]  The four children were present in the home during the incident and witnessed the stabbing.  On the night of the incident, the mother admitted to police that she had stabbed the father.[5]  The Juvenile Court judge initially granted temporary custody of the four children to the maternal grandmother; later, on January 10, 2013, the judge granted temporary custody to a paternal aunt.  However, after evidence of sexual and physical abuse of at least some of the children within the paternal aunt's home became apparent, the department obtained custody of the four children on May 20, 2013.

Ellen was born in March, 2013.  In August, 2013, the mother (believing that the father had engaged in a romantic relationship with a neighbor's daughter) forced her way into the neighbor's apartment while making threats and brandishing a knife.  The mother and the neighbor then went to the neighbor's daughter's house, where the mother attempted to break down the door.  After arriving at the scene, police detected a strong

---

[4] Ellen was added to the petition after she was born in March, 2013, but remained in the mother's care until August, 2013.

[5] While at the hospital after the stabbing, the father told a social worker that he had cut himself accidentally.  At trial in the present case, the mother denied having stabbed the father.

odor of alcohol on the mother's breath, and a patfrisk discovered a seven-inch serrated knife in her pocketbook. The neighbor identified it as the knife with which the mother previously had threatened her. Following that incident, Ellen was removed from the mother's custody.

In July, 2013, Ulrich, who turned ten during the trial, and Charles, who turned eight during the trial, were both placed in a residential treatment facility (residential facility). By the time of trial, Ulrich had been placed in a foster home. Sarah, nearly seven years old by the end of trial, and Amy, who turned five years old during trial, were placed together in the department's foster care in May, 2013. In November, 2013, Sarah and Amy were placed in separate foster homes. Ellen was placed in a kinship foster home in February, 2014, where she remained at the time of trial. We reserve additional details concerning the individual children's circumstances for our discussion of the termination decrees concerning each of them.

As part of her service plan, the mother was required to undergo a psychological evaluation, the results of which were received by the department on November 7, 2013. The mother was diagnosed with mood disorder, posttraumatic stress disorder, and polysubstance dependence. As of November, 2013, the mother had been working with an in-home therapist and was making some progress with regard to childhood trauma and her relationship

with the father.  In January, 2014, the department referred the mother to a residential program where she could be reunited with Sarah, Amy, and Ellen, but the mother chose not to enter that program.  The mother stipulated to her unfitness to parent the children on March 26, 2014.  By March, 2014, the mother's in-home therapist stated that the mother had been meeting with her on a weekly basis.  In September, 2014, the mother entered a residential substance abuse treatment facility but was soon asked to leave after that facility designated her as a safety risk.  By April, 2015, the mother was deemed to be in full compliance with her service plan and had improved her anger management and communication skills.  She had also completed a parenting course and engaged in a parenting support group, and there were no longer substance abuse concerns.  After a home visit on April 2, 2015, the court investigator reported that the mother's four-bedroom apartment was extremely clean and well kept, furnished with beds for the children, and was "nothing short of impressive."[6]  However, at the time of trial, the mother had not seen her mental health therapist in several months and missed a scheduled home visit the week before trial.

Visits between the mother and children ranged from successful to disastrous.  The mother had a successful visit

---

[6] The mother had previously refused a home visit in December, 2014.

with Sarah, Amy, and Ellen on September 29, 2014.  She had successful visits with Ulrich and Charles individually at the residential facility on December 16, 2014.  She also had successful visits with Ulrich and Charles individually at the residential facility on January 30, 2015, and then with Sarah, Amy, and Ellen together on the same day.  On December 23, 2015, the mother had a Christmas visit with all the children at the residential facility, which went well.[7]

However, there were also a number of tumultuous visits.  A June 30, 2014, visit ended with three of the children running out of the visitation room and several of the children crying.  On July 23, 2014, the mother had a visit with all five children.  At that visit, the children were difficult to handle, several were running around the visitation area and crying, and Charles told one of his sisters that he was not going to talk to the mother "until she changes her attitude."  In response, the mother told Charles, "I am fucking done with you.  This is my last visit with you.  I don't want to see you again."  After a social worker cautioned the mother against aiming obscenities at the children, the mother stated, "Don't tell me about my fucking kids, you don't have kids, so you don't know."  The mother also

---

[7] At one point during this visit, a social worker had to console the mother after she was found crying in the bathroom. There was nothing in the record indicating that this negatively affected the visit for the children.

said, "[T]hese kids aren't [my] issue, let their workers deal with them, I'm fucking done." Three weeks later the department informed the mother that her visitation rights would be suspended as a result of this visit. At that time, the mother stated that she did not remember anything negative about the visit, and at trial she testified that she did not swear at the children, only agreeing with the statement that the visit "got . . . a little out of control."[8]

On March 10, 2015, a visit between the mother, Sarah, and Amy went well until the mother whispered something to the girls that caused them to cry throughout the entire twenty-minute return ride to their day care program. On June 12, 2015, the mother had a visit with Ulrich and Charles, at which Ulrich became angry with the mother, refused to talk with her, and left early. A visit with all the children on August 20, 2015, to celebrate Ulrich's birthday ended with Charles throwing a tantrum and being carried away by staff members.[9] At a visit on March 3, 2016, after Charles had left the visitation room crying, the mother pulled him from the arms of a counselor --

---

[8] For a brief time after this visit the department allowed the mother to visit only with Sarah, Amy, and Ellen.

[9] Charles's tantrum occurred after the mother brought him a pet fish -- without consulting the residential facility and against its "no pets" policy -- and Charles learned that he would not be allowed to keep it.

making physical contact with the counselor -- and brought him back into the visitation room while he gave the counselor a "thumbs down" signal. On June 23, 2016 -- one week before trial began -- the mother ended a visit after thirty-five minutes because the children were not taking part in an activity she had organized for them. Additionally, a visit scheduled with the girls for November 24, 2014, had to be canceled after the mother failed to confirm the visit on the preceding day.

The trial concerning the mother's and father's parental rights was held in the summer of 2016, and on November 23, 2016, the judge issued decrees terminating their parental rights. The mother appealed.

Discussion. 1. Motion for stay. After the mother's appeals from the termination decrees entered on our docket, the mother moved to stay appellate proceedings in order to raise a claim of ineffective assistance of counsel through a motion for new trial in the Juvenile Court. A single justice of this court denied the mother's motion. On appeal from that denial, the mother contends that the single justice should have allowed her to pursue the new trial motion in the Juvenile Court, without regard to a threshold assessment of her prospects for success.

A parent facing termination of parental rights is entitled to the effective assistance of counsel. See G. L. c. 119, § 29; Care & Protection of Stephen, 401 Mass. 144, 149-150 (1987). In

assessing a claim of ineffective assistance of counsel in such a case, we apply the familiar two-part test established in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). Consistent with the approach taken in criminal cases, "[a]bsent exceptional circumstances, we do not review claims of ineffective assistance of counsel for the first time on appeal." Care & Protection of Stephen, supra at 150. Instead, where a party wishes to pursue a claim of ineffective assistance of counsel after the case has entered in an appellate court, the preferred approach is for the party claiming ineffective assistance to move to stay the appeal in order to allow prosecution of a motion for new trial in the trial court. See Commonwealth v. Montgomery, 53 Mass. App. Ct. 350, 353 (2001).

Allowance of a motion to stay is not automatic, however:

"Generally, the issue presented with respect to a motion for a stay of the appeal is whether the interests of fairness, balanced with the interests of judicial economy, best will be served by giving priority to a trial court resolution of the defendant's new trial motion. Several factors favor the grant of stays: the possibility that the motion for a new trial will be allowed; the economy of consolidating an appeal from the denial of a motion for a new trial with the direct appeal, see Commonwealth v. Smith, 384 Mass. 519, 524 (1981); the advantages to the defendant of such consolidated review of a motion for a new trial over postappeal review; and the general systemic benefits of earlier retrials in cases in which a motion for a new trial is allowed. Among the reasons for a denial of a request for a stay are the similarities of issues raised in the motion for a new trial and in the direct appeal, and a reluctance to delay appellate review when briefing has been completed and the case has been, or is ready to be, scheduled for oral argument." (Footnote omitted.)

Id. at 354.

Additional considerations weigh prominently in child welfare cases, particularly the interest in the speedy resolution of child custody matters.  See Lassiter v. Department of Social Servs., 452 U.S. 18, 32 (1981); Custody of Two Minors, 396 Mass. 610, 611 n.2 (1986).

Against this background, we discern no error of law or abuse of discretion in any choice by the single justice to consider the prospects of the mother's new trial motion for success in the Juvenile Court if a stay were granted; indeed, such consideration is entirely consistent with the consideration of judicial economy identified in Montgomery as a balancing factor and the interest in prompt resolution of custody. Placing the appellate process on hold to allow prosecution of a fruitless new trial motion in the trial court would serve neither interest.  We accordingly reject the mother's contention in its broadest form, insofar as it assigns error to the mere evaluation by the single justice of the likelihood of her motion for new trial to be successful on its merits.

We likewise discern no error of law or abuse of discretion by the single justice to the extent she determined that the mother's claim of ineffective assistance showed an inadequate prospect for success to justify a stay of appellate proceedings

to allow her to pursue it.  The basis of the mother's claim of ineffective assistance of counsel is the failure of her trial counsel to call the maternal grandmother as a trial witness, to offer testimony regarding (1) the 2012 domestic violence incident that prompted the removal of the four older children from her custody, and (2) the sexual assault of Ulrich and Charles in May, 2013, while they were in the care of a paternal aunt.  On the present record we discern no basis on which to conclude that trial counsel's decision not to call the maternal grandmother as a witness concerning those two matters "was manifestly unreasonable when made" (quotation omitted). Adoption of Yvette (No. 1), 71 Mass. App. Ct. 327, 345 (2008). As a threshold matter, we observe that the mother accused the maternal grandmother of having fabricated the accusation of sexual assault against Ulrich and Charles, and that the maternal grandmother obtained an abuse prevention order against the mother, pursuant to G. L. c. 209A, in 2011.  Accordingly, it would have been entirely reasonable for trial counsel to decide not to call the maternal grandmother as a witness in order to avoid the risk that the department or counsel for the children might elicit testimony from her on cross-examination that would be damaging to the mother.  That the maternal grandmother had direct knowledge of a significant instance of abuse does not establish that she was a critical witness concerning the

children's resulting needs and the mother's ability or inability to address them.

In any event, the evidence of the mother's unfitness was overwhelming, without regard to the matters about which the mother now claims the maternal grandmother should have testified. It is accordingly unlikely that the decision of trial counsel about which the mother now complains had any bearing on the result of the trial. See Adoption of Azziza, 77 Mass. App. Ct. 363, 368 (2010).

We offer one final observation in response to the mother's protest that she did not fully present the parameters of her claim of ineffective assistance in her motion for a stay because she was unaware that she would be required to satisfy the single justice of the potential merit of her proposed new trial motion. For the reasons we have described above, we are satisfied that the present record was adequate to permit the single justice to conduct an assessment of the mother's claim of ineffective assistance, despite its limited scope. But we acknowledge that no published authority has previously expressly recognized a gatekeeping role of the type we have approved in this opinion for the single justice, in deciding whether to allow a stay of appellate proceedings so that a parent in a child welfare case can pursue a new trial motion in the trial court. In future cases, parents who seek to stay appellate proceedings in order

to pursue a motion for new trial in the trial court, whether based on a claim of ineffective assistance of counsel or on other grounds, should include sufficient evidentiary material and argument to allow the single justice to make an informed threshold assessment whether the new trial motion has a sufficiently strong likelihood of success on the merits to justify the resulting delay in completion of appellate review. And the single justice, in performing the gatekeeping role, should carefully balance the importance of a prompt resolution of the case with the possible merit of the proposed new trial motion, while recognizing that applying too stingy a filter would risk prolonging final resolution even further if a postappeal new trial motion finds success.

2. <u>Unfitness and the children's best interests</u>. A person's right to parent her child can be terminated only if a judge determines that she is unfit and that termination is in the best interests of the child. See <u>Adoption of Nancy</u>, 443 Mass. 512, 514 (2005). "These twin determinations are not separate and distinct but, instead, are 'cognate and connected steps' that 'reflect different degrees of emphasis on the same factors.'" <u>Adoption of Malik</u>, 84 Mass. App. Ct. 436, 438 (2013), quoting <u>Adoption of Cesar</u>, 67 Mass. App. Ct. 708, 712-713 (2006). "[P]arental unfitness must be proved by clear and convincing evidence," <u>Adoption of Rhona</u>, 57 Mass. App. Ct. 479,

488 (2003), and we review the judge's determination of the child's best interests for an abuse of discretion.  Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).  "Subsidiary findings must be supported by a preponderance of the evidence, Adoption of Helen, 429 Mass. 856, 859 (1999), and none of the findings will be disturbed unless clearly erroneous.  Adoption of Greta, 431 Mass. 577, 587 (2000).  Custody of Eleanor, 414 Mass. 795, 799 (1993).  We review the judge's findings with substantial deference, recognizing [his] discretion to evaluate a witness's credibility and to weigh the evidence.  Adoption of Quentin, 424 Mass. 882, 886 (1997)."  Adoption of Nancy, supra at 515.

The judge's subsidiary findings of fact amply support his determination that the mother was unfit to parent each of the children separately and together.[10]  The record shows that the mother had a difficult time managing her anger and that this issue had a significant effect on the children.  See Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973) ("Violence of temper . . . might constitute unfitness").  The four oldest children involved in this appeal were removed from the mother's care after she stabbed the father during an

---

[10] We note that, while the judge's findings support the termination of parental rights as to the children individually and together, the mother was seeking to reunify with all five of the children at the same time.

argument, and the youngest child was removed after the mother threatened a neighbor with a knife and then attempted to break down a woman's door because she suspected that the father was being unfaithful. The mother was also asked to leave a substance abuse treatment facility because she was deemed to be a safety risk. Additionally, the mother displayed an aggressive attitude with the children and counselors at a number of visits, including one incident where she shouted obscenities at one of the children along with telling him that "I don't want to see you again." At the same visit, after becoming frustrated with the children, the mother stated, "[T]hese kids aren't [my] issue, let their workers deal with them, I'm fucking done." See Adoption of Adam, 23 Mass. App. Ct. 922, 923 (1986) (negative statements directed at child can be evidence of parental unfitness). Contrary to the mother's contention that this evidence concerning her temper is stale and not an indication of her current or future fitness, a judge can consider a pattern of "past conduct to predict future ability and performance." Custody of Michel, 28 Mass. App. Ct. 260, 269-270 (1990). Here, the judge did not err in using the mother's repeated prior conduct to predict her future interactions with the children.

Furthermore, although the mother did engage in some of the services offered by the department and was at one point fully compliant with her service plan, mere participation in the

services does not render a parent fit "without evidence of appreciable improvement in her ability to meet the needs of the child[ren]." Adoption of Terrence, 57 Mass. App. Ct. 832, 835-836 (2003). See Adoption of Jacques, 82 Mass. App. Ct. 601, 608 (2012) ("judge was entitled to consider the evidence of [the mother's] recent improvements within the context of her earlier and continuing deficits"). At trial, the mother was unable to confirm that she completed an anger management course. She also had not attended therapy during the months leading up to trial. She was not attending a domestic violence program at the time of trial and had not provided her social worker with any certificate of completion from a prior domestic violence program. Nor did her actions indicate that her parenting abilities were improved by the classes she did attend. The mother's inability to consistently attend, complete, and benefit from classes required by her service plan is "relevant to the determination of unfitness." Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987). See G. L. c. 210, § 3 (c) (ii).

The evidence also shows that the mother minimized -- and often completely denied -- the existence of extremely troubling conditions affecting the children. After being confronted with evidence that Ulrich and Charles were sexually abused while in the care of a paternal aunt, the mother denied that any such

conduct occurred and stated that the allegations were concocted by the maternal grandmother. When told of the allegations that several of the children were being physically abused in the paternal aunt's home, the mother failed to investigate or take any other action simply because she had no proof that the allegations were true, even though "she had a suspicion someone may have hit" one of the children.[11] See G. L. c. 210, § 3 (c) (viii). She also refused to acknowledge at trial that Charles was having gender identity issues, stating that he "may have" issues and that she wasn't "too sure because he still identifies himself as a boy." All of this evidence clearly and convincingly establishes that the mother was unfit to parent the children. See Adoption of Rhona, 57 Mass. App. Ct. at 488.

Additionally, the judge found, on clear and convincing evidence, that it was in the best interests of each child to terminate the mother's parental rights. See Adoption of Ilona, 459 Mass. 53, 59 (2011). Ulrich had been diagnosed with attention deficit hyperactivity disorder and posttraumatic stress disorder, and he had been hospitalized several times for aggressive and self-harming behavior. Ulrich's substantial

---

[11] The mother argues that these incidents should not be used as evidence demonstrating her unfitness, as the children were not in her care when they occurred. However, the issue bearing on her unfitness is not that the abuse occurred, but her inaction after learning of it.

mental health issues were often exacerbated by visits or telephone calls from the mother. He required stability, and after his placement in the residential facility, his performance in school improved dramatically. At the time of trial, Ulrich had been placed in the foster home of a former residential facility employee and was happy there. After his placement he displayed a strong bond with his foster mother. The department approved the foster home as an adoptive placement for Ulrich.

Charles "suffered from 'clinically significant' levels of anxiety and depression, [and has been] diagnosed with posttraumatic stress disorder." He also demonstrated "confusion about his gender," had "difficulty deescalating," and struggled in chaotic environments. He required the stability of a two-parent home with no other children in order to ensure that he would receive the attention that he needed to cope with the trauma he has experienced. The mother's decision to yell and swear at Charles, her failure to acknowledge his mental health issues, and her failure to consistently attend services all reflect negatively on her ability to ensure that Charles would be afforded the environment he needs. The department's permanency plan for Charles is to recruit a preadoptive home for him.

Sarah also had been diagnosed with mental health issues, including posttraumatic stress disorder and reactive attachment

disorder. She had difficulties controlling her anger and had ongoing tantrums in school and at home when she did not get her way. While being driven to visits with her family, Sarah relayed incidents of domestic violence between the mother and the father to social workers. She had been receiving services from a behavioral specialist since February, 2014, and sometime before February, 2015, began attending a therapy program for children who have witnessed violence. At the time of trial Sarah remained in the same foster home where she had been for over two years. This home provided her with a great deal of affection, care, and support. Sarah expressed a strong bond with her entire foster family, and her foster mother was eager to help Sarah with her therapy. The department had approved her foster mother as an adoptive parent.

Amy was less than two years old when she was removed from her parents' care and showed fewer symptoms of mental health problems than her older siblings. She exhibited anger issues when she was younger, but by the time of trial she had developed good coping skills and was fitting in well at school. Amy was placed in a foster home in November, 2013. At the time of trial, she had been living in the same foster home for over two years, was happy and comfortable in the home, showed a significant bond with her foster mother, and had an affectionate relationship with the other members of her foster family. Sarah

and Amy were able to visit one another, and their foster families have relied upon each other to watch both girls when necessary. Amy's foster home was approved by the department as a preadoptive home.

Ellen was only a few months old when she was removed from her parents' custody and displayed none of the mental health issues exhibited by her older siblings. Three years old at the time of trial, she had been placed in a kinship foster home, and the mother testified at trial that the foster home provided the type of environment that Ellen required. She exhibited a strong bond with the foster family and was happy and healthy at the time of trial. She received early intervention services, and her foster family had shown a willingness to participate in visits with Sarah's and Amy's foster families. The department approved this foster home as Ellen's preadoptive home.

This evidence firmly supports the judge's conclusion that the mother was unfit to parent each child and that it was in the best interests of each child for the mother's parental rights to be terminated. See Adoption of Nancy, 443 Mass. at 514; Adoption of Hugo, 428 Mass. at 225.

3. Other issues. The four older children raise several additional arguments contesting the termination of the mother's parental rights. We find each of these arguments unpersuasive and address each briefly.

Sarah and Amy (girls) challenge the judge's determination that it was in their best interests to have the mother's parental rights terminated despite the fact that the permanency plan did not provide for their placement in the same adoptive home, as suggested by their department adoption assessments. Contrary to the girls' contention, however, the department is not bound to follow that assessment. Nor is the department required to wait to place the girls in a specific kind of placement, particularly when they had already been living with their foster families for a significant time and had created strong bonds with the foster families, and where the department had already designated those foster placements as preadoptive homes. The judge made findings concerning the bond between the girls, indicating that this bond was taken into account in the determination of their best interests. Moreover, there is no indication in the record that a preadoptive home accommodating both girls was available. The judge's decision to agree with the department's recommendation was not "outside the bounds of reasonable alternatives" and therefore not an abuse of discretion. Adoption of Mariano, 77 Mass. App. Ct. 656, 660 (2010). See Adoption of Garret, 92 Mass. App. Ct. 664, 675 (2018).

The girls also contend that the judge improperly relied on evidence from a separate care and protection case regarding a

child the mother gave birth to in January, 2016,[12] and a department letter that should not have been admitted in evidence. Assuming without deciding that it was improper for the judge to consider this evidence, we discern no prejudice to the mother or the girls, as the remaining evidence overwhelmingly supports -- by clear and convincing evidence -- that the mother was unfit as to the girls and that termination was in their best interests. See Adoption of Astrid, 45 Mass. App. Ct. 538, 546-547 (1998) (no prejudice where judge would have reached same result).

Ulrich and Charles argue that it was not in their best interests to terminate the mother's parental rights as to them, emphasizing that recent events show that the mother's parenting abilities have improved. Ulrich also points to the fact that his proposed adoption plan was disrupted after the entry of the decrees. In these circumstances, we do not consider events that occurred after the entry of the decrees, and we see no error in the judge's decision to terminate the mother's parental rights. Contrast Adoption of Cesar, 67 Mass. App. Ct. at 716 (decree

---

[12] With regard to evidence concerning the mother's care and protection case as to that child, its inclusion was just as likely to help the mother's argument as it was to hurt it. The same judge who presided over the case at hand dismissed that care and protection proceeding, declining to find the mother unfit to parent that child even when that child had serious medical issues.

vacated to allow further proceedings in trial court in light of child's removal from preadoptive home before decree was entered).[13]

Charles argues that the judge should not have terminated the mother's parental rights as to him because the department's permanency plan at the time of the trial -- recruitment of an adoptive family -- did not require such termination. The judge found that Charles "has made progress in the stability that has been provided by the [residential facility]; that progress can be best solidified through the department's efforts to locate a permanent adoptive family for him when he is ready." We see no abuse of discretion in the judge's approval of the department's permanency plan for Charles. See Adoption of Nancy, 443 Mass. at 517 (children "deserve permanence and stability"); Adoption of Dora, 52 Mass. App. Ct. 472, 477 (2001) (termination decree "may issue even if a specific adoptive family has not been identified").

Conclusion. The decrees are affirmed. The order of the single justice denying the motion for a stay of appeal is also affirmed.

_____

[13] We note that a child in the custody of the department is entitled to annual permanency hearings "to determine and periodically review thereafter the permanency plan for the child. . . . The court shall consult with the child in an age-appropriate manner about the permanency plan developed for the child." G. L. c. 119, § 29B.

So ordered.