NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-523

ADOPTION OF HOPE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree issued by a judge of the Juvenile Court finding him unfit and terminating his parental rights to his daughter, Hope.  The father also argues that the judge erred in not granting him posttermination and postadoption visitation with the child.  We affirm.[2]

Background.  We summarize the judge's findings of fact, supplemented by uncontroverted evidence from the record.  In December 2018, Hope was born substance exposed.  Because the mother was married to another man, the father's name did not appear on Hope's birth certificate.  However, since Hope's birth, both the mother and the father asserted that the father was Hope's biological father.  The mother's husband denied paternity.  One week after Hope's birth, the Department of

---

[1] A pseudonym.

[2] The mother's parental rights were also terminated.  She did not appeal.

Children and Families (department) was granted emergency temporary custody of her.  The department initially offered visits and recommended therapy to the father.  However, in January 2019, the department stopped offering visits because the father failed to take steps to establish paternity.  The department did not offer the father visits or services until he established paternity in March 2021.

The father has an extensive criminal history consisting of sixty-one charges as an adult, including convictions of resisting arrest, larceny, assault and battery, aggravated assault and battery, possession with intent to distribute heroin, and distribution of cocaine.  In October 2019, both the father and the mother were arrested following the execution of a search warrant at their apartment, where police seized cocaine. In March 2021, the father was arraigned on cocaine trafficking charges in the Superior Court.  At the time of trial, the trafficking charges were still pending against the father.

The father also has a history of abusive behavior toward the mother.  The father reportedly controlled the mother's money and cell phone, and he had posted nude photos of her on social media.  The mother said that the father forced her to change doctors because her gynecologist was a man.  The mother also reported that, when she had gained weight, the father hid food from her.  The father has locked the mother in his apartment.

In 2016, the mother obtained a restraining order against the father.[3]  After the department obtained custody of Hope, the mother reported that she was not comfortable around the father and that she would not go home from the hospital that day because the father had been physically violent with her in the past.  Ten days after Hope was born, the maternal step-grandmother reported that the father "destroyed" the mother and father's apartment and would not allow the mother to pack a bag of clothes before she left.  In 2020, the father reportedly withheld the mother's money and belongings.  In the spring of 2022, the father reportedly followed the mother, jumped into her car while she drove, assaulted her, and stole her money.  To his credit, the father acknowledged to a department worker that he and the mother had an "unhealthy" relationship to which he would not want Hope exposed.

Throughout the case, the father refused to engage with the department and acted combatively when he did speak with the department's workers.  The father had a series of different department social workers because he often refused to work with the social worker assigned to him.  When a department social worker met with the father and the mother one day before Hope's removal, the father said he did not need therapy, yelled at the

_____

[3] In 2011, the father's former girlfriend also obtained a restraining order against him.

3

social worker, and threatened him.  The father screamed and swore at other social workers, making statements like "[g]et off my case" and "you're going to see what's going to happen."  Due to safety concerns, the department eventually required visits to occur at its office with police present.

After the father established paternity, he refused to review his action plan or engage with services for months.  He claimed that he began a substance abuse evaluation, but he could not recall any steps or recommendations when asked about it.  The father declined a psychological evaluation, individual therapy, and an intimate partners program.  The father repeatedly missed appointments with the department or failed to schedule them for up to three months at a time.

Nine months after he established paternity and received an action plan, the father completed intake at a treatment center where he consistently attended anger management training and a parenting group.  However, he demonstrated little insight into his controlling behaviors and was not forthcoming about his history of domestic violence and conflict with the department.  The father did not attend visits with Hope for four months in 2022.  When he did attend visits with Hope, he arrived prepared and was attentive to Hope.

Discussion.  1. Termination of parental rights.  "To terminate parental rights to a child and to dispense with

4

parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted). Adoption of Oren, 96 Mass. App. Ct. 842, 844 (2020). "[T]he 'parental fitness' test and the 'best interests of the child test' are not mutually exclusive, but rather 'reflect different degrees of emphasis on the same factors.'" Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Care & Protection of Three Minors, 392 Mass. 704, 714 (1984). In making a best interests determination, the judge considers "'the ability, capacity, fitness and readiness of the child's parents' as well as 'the plan proposed by [the department].'" Adoption of Garret, supra at 675, quoting Adoption of Nancy, 443 Mass. 512, 515-516 (2005).

The parent's fitness is "determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). "The inquiry is whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child'" (citation omitted). Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011). "We give substantial deference to a judge's

5

decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

a. The judge's findings. "Unless shown to be clearly erroneous, we do not disturb the judge's findings, which are entitled to substantial deference." Adoption of Jacques, 82 Mass. App. Ct. 601, 606-607 (2012). "A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Adoption of Larry, 434 Mass. 456, 462 (2001). "We accord deference to a trial judge's assessment of the credibility of witnesses and the weight of the evidence." Adoption of Olivette, 79 Mass. App. Ct. at 157.

The father argues that the judge erred by finding that the father had "been represented by counsel since the beginning of the case."[4] Where the judge's reference to "the case" included the period before the father established paternity, this finding

---

[4] The finding appears only in the conclusions of law section of the judge's decision. However, the conclusions of law rely on an implicit finding that the father had been represented by counsel during the period prior to paternity establishment.

6

was not supported by the evidence.[5]  However, because the remaining 245 findings the judge made establish the father's unfitness by clear and convincing evidence, we are not persuaded that the erroneous findings warrant reversal.  See Adoption of Valentina, 97 Mass. App. Ct. 130, 138 (2020) (affirming unfitness determination where four of 122 factual findings were premised on impermissible evidence and thus disregarded).

b.  The father's unfitness.  The finding of the father's unfitness resulted from a "constellation of factors."  Adoption of Greta, 431 Mass. 577, 588 (2000).  The father did not consistently "maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit."  Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987).  Despite the department's intervention, the father failed to participate in services and treatment to sufficiently address the issues that caused the removal of Hope.[6]  See Adoption of Serge, 52 Mass.

_____

[5] The father also asserts that he was entitled to counsel and visits with Hope before he established paternity.  Because he had neither counsel nor visits with Hope, he contends that the department did not make reasonable efforts to reunify, and the unfitness determination is based on erroneous findings.  This argument was not raised at trial, so it is waived.  See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006); Adoption of Mary, 414 Mass. at 712.  Thus, we do not address it.
[6] The father argues that the judge erred by finding that the department could not legally offer visits with Hope until the father established paternity.  The judge made no such finding.  Rather, the judge found that a department supervisor told the

7

App. Ct. 1, 8 (2001) ("The mother's lack of meaningful participation in recommended services was . . . relevant to the question of her fitness").  To the extent that the father did engage in services, he was untruthful during therapy sessions, and the judge found that he did not benefit from them.  See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019), quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, supra (parent's failure to benefit from services "relevant to the determination of unfitness").

To the extent the father argues error in the judge's reliance on an unresolved criminal case, the judge did not find that the father was unfit because of his pending charges alone.  Rather, the judge merely noted the potential of the father's incarceration causing disruption to Hope in the context of the father's properly weighed criminal history as one factor in the unfitness determination.  See Care & Protection of Frank, 409 Mass. 492, 495 (1991) ("evidence of prior criminal convictions may be properly weighed in the balance").  The father's history of domestic violence and controlling behavior with the mother,

father that visits could not be offered because of the father's "presentation and failure to establish paternity."  As discussed above, the father was not cooperative with the department and frequently threatened its workers, making visitation impracticable.  We do not address whether the department was prohibited legally from offering visits until the father established paternity.

8

combined with his lack of insight into his responsibility for that behavior, places Hope at risk. See Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005) ("Violence within a family is highly relevant to a judge's determination of parental unfitness and the best interests of the children"). We discern no abuse of discretion in the judge's determination that the father's unfitness would persist, and therefore termination of his rights was in Hope's best interests. See Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012) ("Where there is evidence that a parent's unfitness is not temporary, the judge may properly determine that the child's welfare would be best served by ending all legal relations between parent and child").

2. Parental visitation. "In terminating parental rights pursuant to G. L. c. 210, § 3, the Juvenile Court judge has the equitable authority to order visitation between a child and a biological parent where such contact is in the best interests of the child." Adoption of Garret, 92 Mass. App. Ct. at 679. "Whether such contact in any given case is wise is a matter that should be left to the discretion of the judge." Youmans v. Ramos, 429 Mass. 774, 783 (1999). "A judge should issue an order of visitation only if such an order, on balance, is necessary to protect the child's best interest." Adoption of Ilona, 459 Mass. at 65. A judge may consider "whether a preadoptive family has been identified and . . . whether the

child 'has formed strong, nurturing bonds' with that family."
Id. at 64, quoting Adoption of Rico, 453 Mass. 749, 754 (2009).

The department did not offer the father visits with Hope for over two years because he did not take steps to establish paternity, despite being told he must establish paternity before he would be able to visit her. Once he established paternity in March 2021, the father visited Hope inconsistently. He did not attend a visit with Hope for over four months in 2022. For over nine months after he received his action plan, the father did not engage in any of the recommended services that might reunite him with Hope. Moreover, Hope has been in her preadoptive home for the majority of her life and has formed bonds with her foster family. Hope is comfortable with her preadoptive siblings and parents, whom she refers to as "mommy and daddy." Her preadoptive home also neighbors her maternal grandparents' home. We are satisfied that the judge carefully weighed the evidence and thus did not abuse her discretion by declining to

make a specific order of visitation.  See <u>Youmans</u>, 429 Mass. at 783.

                                        <u>Decree affirmed</u>.

                                        By the Court (Wolohojian,
                                          Englander & Brennan, JJ.[7]),

                                        Assistant Clerk


Entered:  March 12, 2024.

---

[7] The panelists are listed in order of seniority.