NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1255

ADOPTION OF YENZI (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On appeal from decrees entered in the Juvenile Court terminating his parental rights, the father challenges the trial judge's finding that he is unfit and the termination of his parental rights.[2]  He also assigns error to the judge's failure to order more than two visits per year of post-termination and post-adoption visitation for himself and any visitation between the children and their half-sibling.  We affirm.

Background.  We briefly summarize the facts found by the trial judge, noting the limited instances in which the father challenges the judge's findings as clearly erroneous.  Yenzi was born in June 2016.  The mother tested positive for amphetamines

---

[1] Adoption of Kendra.  The children's names are pseudonyms.

[2] The mother filed a notice of appeal but filed no brief. We consider only arguments advanced by the father.

and buprenorphine during her pregnancy and Yenzi was placed on neonatal morphine to address her symptoms of Neonatal Abstinence Syndrome (NAS). Yenzi was placed in the custody of the Department of Children and Services (department) at birth and remained in the custody of the department for approximately eighteen months, until January 2018 when she was returned to the mother's care. Kendra was born in August 2017. The department filed a care and protection petition for Kendra, but the mother maintained custody of Kendra.

The father has three children with a now-deceased woman and those three children are in the care of their maternal grandmother. The father does not pay child support and has never engaged in a primary caretaking role of those children. The father admitted that he was unable to care for those children.

The father and mother have five children together including Yenzi and Kendra. The father has never paid child support for Yenzi and Kendra. The three older children are in the permanent guardianship of their maternal grandmother and the father lacked any insight as to why the children were under a guardianship.

The father has an extensive adult criminal history beginning in 1991 and continuing through 2019.[3] The judge did

_____

[3] The father's criminal history includes convictions for larceny, malicious destruction of property, possession of a

not credit the defendant's testimony that he had never been convicted of a crime. The father has had eleven restraining orders issued against him on behalf of four different women and, in some instances, his minor children. On April 22, 2019, the mother obtained a restraining order against the father ordering him not to abuse her, to have no contact, and stay away and vacate her residence. He was also ordered to have no contact with Yenzi and Kendra. The restraining order expired on October 21, 2019.

There has been considerable domestic violence during the relationship of the mother and the father, including physical violence and verbal abuse in the presence of Yenzi and Kendra, which the father minimizes. The April 22, 2019, restraining order described above was issued to the mother based on an altercation that took place on April 19, 2019. On that day, the mother called the police stating that the father was yelling at her, they ended up on the ground, and she thought the father had tackled her. Yenzi and Kendra were present during this incident. Police who responded to the mother's call saw bruising, swelling, and redness on her arm. Later, the father

---

firearm without a license, assault and battery by means of a dangerous weapon, assault and battery on a police officer, knowingly receiving stolen property, leaving the scene of property damage, possession to distribute cocaine, and possession to distribute a class D substance, among others.

3

left the mother twenty-five threatening text messages, and the mother then sought a restraining order against the father. In her affidavit, the mother stated that the father had been "mentally, physically, and emotionally abusive for the last six years or so." The judge did not credit the father's testimony denying that the restraining order was because he had abused the mother.

The father engaged in threatening and controlling behavior of the mother throughout their relationship up to May 2, 2022. Specific instances include the father breaking the mother's door, stealing the mother's belongings, trying to run the mother over, hiding the mother's SCRAM machine,[4] and numerous 911 calls made by the mother regarding the father. On May 2, 2022, during a three way conversation between the mother, the father, and a social worker, the father berated the mother for at least three minutes during which the father called the mother a "child molester," and other vulgar derogatory terms and said he was going to "fuck her up." The father denied or minimized the domestic violence throughout the relationship. Even though he engaged in anger management classes and completed an intimate partner abuse education program, the father lacked insight into domestic violence. Additionally, the court did not credit the

---

[4] "SCRAM" stands for "Secure Continuous Remote Alcohol Monitor."

father's testimony that he was never involved in an abusive relationship or committed any physical violence.

By the time of trial, the father had not engaged in most of his action plan tasks and he initially refused to allow a home visit. The father lacked insight into his need to engage in therapy and has not benefitted from the therapy in which he has participated. The father challenges as clearly erroneous the judge's finding that domestic violence "permeated" the relationship between the mother and the father and the judge's finding that the children were exposed to verbal abuse by the father against the mother.

Discussion. 1. Father's unfitness. a. Standard of review. After trial, the judge prepared "specific and detailed findings" supporting the conclusion that the father was unfit to parent the children and that his unfitness was not temporary. Adoption of Quentin, 424 Mass. 882, 886, 888 (1997). See Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018) (judge must "find that the current parental unfitness is not a temporary condition"). We review a decision to terminate parental rights for abuse of discretion or clear error of law. Adoption of Elena, 446 Mass. 24, 30 (2006). We afford deference to the trial "judge's assessment of the weight of the evidence and the credibility of the witnesses" (citation omitted). Adoption of Quentin, 424 Mass. 882, 886 (1997). To terminate

parental rights, the trial judge "must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).

b. Father's factual challenges. The father claims that the judge's findings that that domestic violence "permeated" the parents' relationship and exposed the children to "verbal abuse" were clearly erroneous. He submits that this characterization was erroneous because no violent incidents occurred within two years of the trial. The judge, however, was evaluating the parents' entire relationship, which has lasted "at least ten years." The decline in violence in the period before the trial did not preclude the judge from finding that domestic violated permeated the parents' relationship as a whole. The record also supports the judge's finding that the children were exposed to verbal abuse. An April 2019 report pursuant to G. L. c. 51A, for example, details an incident in which the father antagonized and yelled at the mother in the presence of one of the children.

The father also claims that the judge's findings of fact, are misleading and not even-handed. See Adoption of Imelda, 72 Mass. App. Ct. 354, 365 (2008). The judge did credit that the father was consistent with his therapy throughout June and July

6

2020, he completed a psychological evaluation in 2021, and he completed an anger management course and domestic violence training program. Although it is true that the judge ultimately found that the father did not benefit from these services, that finding turned on credibility determinations and viewed as a whole, the judge's findings and conclusions do not simply ignore evidence favorable to the father. See Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008), quoting Adoption of Helen, 429 Mass. 856, 859 (1999) ("The judge's findings are both 'specific and detailed,' demonstrating, as we required, that close attention was given to the evidence" [footnote omitted]).[5] We discern no abuse of discretion.

c. Domestic violence. The father argues that the evidence of his role in domestic violence was insufficient to support the judge's conclusion that he was permanently unfit. Additionally, he claims that the judge considered past domestic violence and did not consider any progress he had made prior to trial. Domestic violence is "highly relevant to a judge's determination

_____

[5] The father claims that the judge drew an adverse inference against him due to English not being his primary language. This issue was not raised below and it is waived. See Adoption of Gregory, 434 Mass. 117, 120 n.1 (2001). Even were the issue not waived, we find no support to this argument. The father was represented by counsel and at no time did the father or the attorney request the assistance of an interpreter. The father communicated with the department through the course of several care and protection proceedings.

7

of parental unfitness." Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005). This court has clarified that a parent's improvements in addressing domestic violence do "not preclude consideration of past behavior as a means of predicting the likely future." Care & Protection of Olga, 57 Mass. App. Ct. 821, 830 (2003). The judge's findings about the father's history of domestic violence, minimization of that violence, inability to understand the effects of domestic violence on the children, and failure to benefit from programs designed to address domestic violence, were all amply supported by the record. Although the father presented differing testimony at trial, the judge repeatedly did not find him credible on those issues. See Adoption of Nancy, 443 Mass. 512, 515 (2005).

The father also minimized the domestic violence in the family. See Adoption of Lisette, 93 Mass. App. Ct. 284, 294 n.15 (2018) ("A parent's willingness to ignore or minimize abusive behavior can be an indicator of unfitness, regardless of whether the child is at risk of abuse or witnessing abuse"). Additionally, some of the domestic violence incidents took place in front of the children. "It is well established that exposure to domestic violence works a 'distinctly grievous kind of harm' on children" that can include imperiling their physical safety and psychological development. Adoption of Talik, 92 Mass. App. Ct. 367, 374 (2017).

8

The father argues that the judge abused his discretion by focusing on stale instances of domestic violence perpetrated by the father against the mother. We are unpersuaded. The father was physically abusive to the mother causing pain and bruising to her shoulder and forearm. Additionally, the mother detailed a six-year history of verbal abuse and the father's egregious and demeaning verbal tirade during a conversation with the mother took place in May 2022, one month after the trial was scheduled to begin.

d. Father's failure to benefit from services. We discern no abuse of discretion in the judge's determination that, despite the father's participation in many of the services available to him to learn about domestic violence and improve parenting skills, his failure to benefit from those services left him unfit to parent the children. Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019) (parent's inability to benefit from classes relevant to unfitness determination).

2. Posttermination and postadoption visitation with the father. The judge ordered visitation with the father two times per year subsequent to any adoption or guardianship of the children. The power to order posttermination and postadoption contact rests within the discretion of the trial judge. See Adoption of Rico, 453 Mass. 749, 756 (2009). Where, as here, "an adoptive family is available and postadoption visitation is

9

sought, '[a] judge should issue an order of visitation only if such an order, on balance, is necessary to protect the child's best interest.'" Adoption of Cadence, 81 Mass. App. Ct. 162, 167-168 (2012), quoting Adoption of Ilona, 459 Mass. 53, 65 (2011). "The judge may properly decline to order visitation when the adoptive parent's discretion to make decisions regarding contact will adequately serve the child's best interests." Adoption of Cadence, supra at 168. The judge must weigh any "intrusion that an order imposes on the rights of the adoptive parents, who are entitled to the presumption that they will act in their child's best interest." Adoption of Ilona, supra, at 64-65.

The judge's determination that the visitation order was in the children's best interests was an appropriate exercise of her discretion. The father struggled with insight into the effect that his promises and demands were having on the children and the difficult time the children were having with the father's visits. The judge credited the expert testimony that Yenzi's symptoms of anxiety had reduced since visits with the mother and the father had decreased. Even where a bond exists between a parent and child, providing a basis for postadoptive visitation, such an order is not automatic, and is warranted only where it is in the best interests of the child. See Adoption of Ilona 459 Mass. at 63-64. And an order for a specific minimum number

10

of visits merely sets a floor, leaving to the adoptive parents the possibility of additional visits if they would be in the best interests of the child and permissibly balancing the children's interests with the rights of the preadoptive family. See Adoption of Zander, 83 Mass. App. Ct. 363, 366 (2013). We discern no abuse of discretion in the order requiring two visits per year.

3. Sibling visitation. The father alleges that the judge erred by failing to issue orders of visitation between Yenzi and Kendra and their half-brother, Josh.[6] If siblings are separated through adoption, a judge "shall whenever reasonable and practical and based upon the best interests of the child, ensure that children . . . shall have access to and visitation with siblings." G. L. c. 119, 26B (b). The judge's order should specify whether sibling visitation is in child's best interests and if so, specify the form and schedule of such visitation. Adoption of Rico, 453 Mass. at 753 n. 12.

Where the judge did not make a finding that sibling visitation was in the children's best interests, there is no obligation to order such contact.[7] See generally Care &

_____

[6] A pseudonym.

[7] The judge here does not appear to have been asked to make findings as to whether such visitation was in the children's best interests. Cf. Adoption of Zander, 83 Mass. App. Ct. 363, 367 (2013) (where "judge acknowledged the necessity of sibling

11

<u>Protection of Jamison</u>, 467 Mass. 269, 284 (2014) ("the 'best interests of the child' standard does not establish a presumption in favor of sibling visitation").  "The standard permits visitation only where the petitioning child has demonstrated by a preponderance of the evidence that visitation would serve the best interests of each sibling subject to a visitation order."  <u>Id</u>.  In these circumstances, we discern no error in the judge's failure to make a sibling visitation schedule.  If the children are dissatisfied with not having visitation with their half-sibling, they can file a motion pursuant to G. L. c. 119, § 26B (<u>b</u>).  See <u>Adoption of Rico</u>, 453 Mass. at 757; <u>Adoption of Flavia</u>, 104 Mass. App. Ct. 40, 56, 57 (2024).

<u>Decrees affirmed</u>.

By the Court (Singh, Hand & D'Angelo, JJ.[8]),

*Paul Little*

Clerk

Entered:  July 30, 2024.

---

visitation, but left the timing and frequency of such visits to the discretion of the adoptive parents" this court remanded for judge to provide schedule for posttermination and postadoption sibling visitation).

[8] The panelists are listed in order of seniority.

12