NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-752

ADOPTION OF ELI (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On appeal from decrees entered in the Juvenile Court pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3, the mother and the father of Eli and Grant, identical twins born in 2013, claim that the judge erred in determining that the mother's unfitness was likely to continue and that termination of the rights of both parents was in each child's best interests.  They allege that the judge gave undue weight to a single episode of domestic violence; erred by relying on evidence of domestic violence and the mother's mental health, because that evidence was stale and had no nexus to her parenting abilities; and improperly considered the parents' poverty.  Concluding there was clear and convincing evidence to support the decrees, and discerning no abuse of discretion by

---

[1] Adoption of Grant.  The children's names are pseudonyms.

the judge, see Adoption of Ulrich, 94 Mass. App. Ct. 668, 675 (2019), we affirm.

Background. We summarize the judge's relevant findings of fact, supplemented by uncontested evidence from the record,[2] recognizing at the outset that the father does not challenge the finding of his own unfitness. In May 2016, following the twins' second removal from the parents' custody over concerns they were not being adequately fed, the Department of Children and Families (department) filed a petition alleging that Eli and Grant were children in need of care and protection.[3] See G. L. c. 119, § 24. The twins were returned to the parents' custody about one week later after hearing; removed again the next month due to homelessness and missed medical appointments; and then again returned to the parents' care after about one week. In December 2016, the twins were diagnosed with failure to thrive because they were not gaining weight. Eli's weight was in the ninth percentile while Grant's was in the second. In March

---

[2] The judge made 403 findings of fact that "are both specific and detailed, demonstrating, as we require, that close attention was given to the evidence." Adoption of Don, 435 Mass. 158, 165 (2001).

[3] The first removal was conducted by a different State's child welfare agency when the twins were two weeks old, and they were returned to the parents six months later. The second removal -- the first by the department -- was additionally prompted by concerns that the family was homeless, the mother was using physical discipline, and the mother was not following up with medical appointments for Eli and Grant.

2017, for the fourth time in three years, the twins were removed from the parents' care after they witnessed a physical altercation between the mother and father.  In describing this incident to the department, the mother stated the father pushed the children into a bedroom before choking her and slamming her head into a wall while the boys ran in and out of the room.  The mother also reported that the father had been physically abusive to her in the past.  At trial the father denied the allegations, and the mother denied that the father was abusive in the past, but the judge did not credit their testimony.

Eli and Grant have specialized needs requiring extraordinary attentiveness.  The twins were born prematurely. Each twin was deaf in one ear and had been diagnosed with Dilantin syndrome and a heart murmur.  Eli was also diagnosed with autism spectrum disorder, attention deficit hyperactivity disorder (ADHD), and global developmental delays.  He requires significant supports both in school and in the home, including occupational therapy, physical therapy, and speech therapy.  Eli also needs caretakers who understand his diagnoses and can help him engage in the services he needs to progress developmentally. In 2019, Eli transitioned from a foster home to a group home placement where his needs could be met by around-the-clock, one-on-one therapeutic care.  He made "tremendous improvement" there

3

such that, by the time trial ended three years later,[4] his aggressive behaviors "stabilized significantly."  He could speak in almost full sentences, use words to express what he wanted, had achieved improved physical strength, and could toilet independently.  Eli was ready to step down to a less restrictive setting, provided there was "structure and predictability in his day."

Grant has also been diagnosed with global developmental delays and takes medication for ADHD.  In addition, Grant has been diagnosed with a trauma-related disorder.  Grant requires a rigid structure in his home environment and extensive in-home behavioral and educational support, in addition to the services he receives at school.  He receives that support in his preadoptive home because the preadoptive mother is a special education teacher and board-certified behavioral analyst.  Though Grant has greater language abilities and has achieved more independence in his basic living skills than Eli, Grant still needs a caregiver who understands his needs and can help him engage in the necessary services to continue making developmental progress.  Grant's preadoptive mother understands his needs, because she was the preschool teacher of both Grant and Eli.

---

[4] Trial was delayed several times because of the COVID-19 pandemic.

Discussion.  "In deciding whether termination of parental rights will serve the child's best interests, '[t]he inquiry . . . is not whether the parent is a good one, let alone an ideal one; rather, the inquiry is whether the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.'"  Adoption of Cadence, 81 Mass. App. Ct. 162, 168 (2012), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 1998).  "Where there is evidence that a parent's unfitness is not temporary, the judge may properly determine that the child's welfare would be best served by ending all legal relations between parent and child."  Adoption of Cadence, supra at 169.  "[W]e rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary."  Adoption of Ilona, 459 Mass. 53, 59-60 (2011).  "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period."  Id.

Many of the parents' challenges in this case "amount to no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding witnesses."  Adoption of Don, 435 Mass. 158, 166 (2001).  Having carefully reviewed the record, "[w]e see no basis for disturbing the judge's view of the evidence."  Adoption of Quentin, 424 Mass.

882, 886 n.3 (1997). Even after sporadically engaging for six years in some of the multitude of programs recommended by the department, the mother did not demonstrate insight into the needs of Eli and Grant, as evidenced by her failure to acknowledge the serious nature of their developmental delays, her continued use of inappropriate language and parenting techniques with the children during visits, and her statements that "she does not know what the boys' needs are and that she does not understand their needs."

Moreover, the mother was unable to accept the redirection and suggestions of social workers, parent mentors, and clinical staff when interacting with Eli and Grant. She would curse, yell, and scream in the presence of the twins, even if it was not directed at them, though sometimes it was. The mother demonstrated an inability to parent Eli and Grant at the same time; her presence "would cause a shift in the boys' actions," and they seemed "to be physically upset when in the room with Mother in ways that they were not with other adults," suggesting that she had not used appropriate parenting strategies with them in the past. Cf. Adoption of Ulrich, 94 Mass. App. Ct. at 676 ("record shows that the mother had a difficult time managing her anger and that this issue had a significant effect on the children"). Nor had she ameliorated this issue in such a way that the twins changed their responses to her presence.

6

Frequently they "could not handle staying for the full thirty-minute visit," with both boys exhibiting aggression and Eli in particular becoming dysregulated, because the parents tried to restrain him as a form of behavioral modification, resulting in him head-banging, throwing objects, and hitting. Mere participation in services does not render a parent fit without evidence of appreciable improvement in her ability to meet the needs of the child, see Adoption of Ulrich, supra, and the mother was not entitled to an indefinite opportunity to reform. See Adoption of Cadence, 81 Mass. App. Ct. at 169.

The mother did not articulate any realistic plan for meeting the complex emotional and physical needs of Eli and Grant, together or as individuals. See Adoption of Paula, 420 Mass. 716, 730 (1995). Though at one point she acknowledged the services that would need to be in place if one or both children were returned home, she also said she "would not be engaged in any services if the children were reunified with her and [the department] was no longer involved," suggesting a level of instability and uncertainty that made it unlikely the mother "would be vigilant about accessing services on behalf of the twins." Adoption of Flavia, 104 Mass. App. Ct. 40, 52 (2024). When "combined with each twin's significant needs requiring recognition and appreciation for the appropriate response," this was a risk the judge was not required to take. Id. at 48. See

7

Adoption of Ulrich, 94 Mass. App. Ct. at 676 ("judge did not err in using the mother's repeated prior conduct to predict her future interactions with the children"). Regardless whether a specific nexus could be identified between the mother's mental health issues and her inability to meet the twins' needs, that overall inability itself was powerful evidence of unfitness.

The mother did not attend treatment meetings at Eli's group home or "attend visits with the children in the morning or around lunchtime, as these were her [emotional support] dog's training hours." She had not attended the twins' individualized education plan meetings for several years due in part to her inability to control her behaviors and act appropriately, and she often was unable to control her temper during foster care reviews, resulting in a tense, adversarial environment rather than a cooperative discussion about how best to serve the interests of Eli and Grant. See Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987) ("the refusal of parents to maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit are relevant to the determination of unfitness"); Adoption of Yvonne, 99 Mass. App. Ct. 574, 580 (2021) (parent's inability to control temper relevant to determination of unfitness). Though the mother engaged in individual therapy "with some progress made," and though since

8

2019 she had maintained a one-bedroom apartment, the mother remained "overwhelmed with her own problems," Adoption of Gwendolyn, 29 Mass. App. Ct. 130, 134 (1990), such that "[a]t no point . . . did it appear that she was near ready to resume full responsibility for her [sons]." Adoption of Paula, 420 Mass. at 730. She received food stamps and was unemployed due to her various mental and physical health conditions, for which she received disability benefits.[5] The mother planned to rely on this support and financial assistance from the father if the twins were reunified with her, a plan that was relevant to the judge not because it reflected the mother's poverty but because "it is in the children's best interests to be in safe, stable homes with responsible caretakers who are dedicated to their safety and well-being." Not only was the mother's plan "not a definitive, well-established" one given that government assistance is not guaranteed, but there was no evidence about the father's net income or what he did with it.[6] In assessing

_____

[5] The mother was diagnosed with posttraumatic stress disorder and associated anxiety; was diagnosed as a child with schizophrenia, bipolar disorder, and depression; and was also diagnosed as a child with a seizure disorder, with the seizures brought on by stress and the last one occurring in 2018. She attributed her disability benefits to physical problems like scoliosis, regional pain syndrome in the left hip, asthma, diabetes, high blood pressure, and high cholesterol.

[6] The father consistently reported working, but he never obtained housing, and he suffered from physical ailments that

9

the mother's future fitness and the best interests of Eli and Grant, the judge was entitled to weigh the mother's lack of forethought into how she would finance her rent and other necessities if the twins were returned to her care against her and the father's historic inability to provide a stable home environment for themselves or the children.  See Adoption of Yvonne, supra at 580-581, and cases cited.  See also Adoption of Paula, 420 Mass. at 729 (judge "properly may rely on evidence of past parental abuse or neglect to the extent that this evidence has relevance to current parental fitness").[7]

We are not persuaded by the parents' claim that the judge placed undue weight on the mother's "old mental health history" and the March 2017 episode of domestic violence, or that the judge failed to identify a sufficient nexus between those issues and potential harm to the twins.  The judge expressly "considered the evidence in the aggregate," which was that the

prevented him from visiting with the twins so could also prevent him from working.

[7] Because "[a] judge whose order will have the effect of irreversibly terminating the legal parent-child relationship must focus on the present circumstances of the parent and the child," Adoption of Paula, 420 Mass. at 731, it does not undermine the sufficiency of the evidence that, in 2016, the judge twice returned the twins to the parents following temporary custody hearings.  Nor did those temporary reunifications preclude the judge from considering the evidence from 2016 and earlier as part of a continuing pattern demonstrating the mother's overall unfitness.

mother had "visceral reactions" to questions about domestic violence and refused to answer questions about the March 2017 episode. The mother continued to minimize the violence in her relationship with the father and demonstrate an "inability or unwillingness to seek redress when abused by Father, even when this abuse occurred in the presence of the children."

The father also was dealing with mental health issues that prevented him from broaching the subject.[8] For the judge, this raised "continued concerns about the safety of the children [were] they returned to Mother's care," because neither parent had "engaged in any services to address or acknowledge their roles in domestic [violence] incidents that the children witnessed or may have witnessed." Considering the totality of the circumstances, the judge did not err in concluding that returning Eli and Grant to the care of their parents "would place them in a position of increased likelihood that their needs would be left unmet, and their behaviors would regress." See Adoption of Flavia, 104 Mass. App. Ct. at 49.

The subsidiary findings thus provide clear and convincing support the judge's determination that the mother was unfit to parent Eli and Grant, separately and together, and that her

---

[8] The father was also diagnosed with posttraumatic stress disorder and associated anxiety and had panic attacks when the topics of domestic violence or his relationship with the mother were raised.

11

unfitness was likely to continue.  The same "constellation of factors" also supports the judge's conclusion that termination of each parent's rights was in the best interests of Eli and Grant.  Adoption of Yvonne, 99 Mass. App. Ct. at 582, quoting Adoption of Greta, 431 Mass. 577, 588 (2000).  The twins were three years old when they came into the department's custody and nine years old when trial ended.  In all that time "the mother and the father had not fully addressed their deficiencies to the degree that they would not recur were the twins placed back with them, such that neither parent was or soon would be able to provide [Eli] and [Grant] with a safe, stable home with responsible caretakers dedicated to their safety and well-being."  Adoption of Flavia, 104 Mass. App. Ct. at 50.  At some point, the judge must say "enough" (citation omitted).  Adoption of Ilona, 459 Mass. at 60.  When we also consider the extraordinary progress that Eli and Grant made when they were removed from the parents' care and came under the care of persons dedicated to their success and wellbeing, "we conclude that the judge did not abuse h[er] discretion in finding that the best interests of [Eli and Grant] were served by terminating" the parental rights of each parent.  Id.

Decrees affirmed.

12

By the Court (Milkey, Sacks &
   Smyth, JJ.[9]),

Clerk

Entered:  August 5, 2024.

---

[9] The panelists are listed in order of seniority.

13